UNITED STATES of America upon the relation and for the use of the TENNESSEE VALLEY AUTHORITY

v.

72.0 ACRES OF LAND, MORE OR LESS, IN MONROE COUNTY, TENNESSEE, Austria Cummings Harrison et al.

Civ. No. 3–74–278.

United States District Court, E. D. Tennessee, N. D.

March 25, 1976.

Supplemental Memorandum April 9, 1976.

Robert H. Marquis, Beauchamp E. Brogan, Beverly S. Burbage, Chief Condemnation Atty., Herbert S. Sanger, Jr., Gen. Counsel, Charles W. Van Beke, Asst. Gen. Counsel, L. Gray Geddie, Jr., Knoxville, Tenn., for Tennessee Valley Authority.

W. P. Boone Dougherty, Knoxville, Tenn., J. Granville Clark, Russellville, Ky., for defendants.

## MEMORANDUM

ROBERT L. TAYLOR, District Judge.

This is an action for review of a condemnation award pursuant to Rules 71A(h) and 53(e)(2) of the Federal Rules of Civil Procedure. A Commission appointed by the Court under Rule 71A(h) viewed the property and heard four days of proof on the question of just compensation. In a report filed on November 21, 1975, the Commission found that the landowners suffered damages as a result of the taking in the amount of $62,000.00.

Both sides filed exceptions to the report. The Court, after examining the entire record, concluded that the report lacked the specificity required by the Supreme Court in *United States v. Merz*, 376 U.S. 192, 84 S.Ct. 639, 11 L.Ed.2d 629 (1963), and remanded the case to the Commission with instructions to make subsidiary and ultimate findings of fact and conclusions of law. The Commission filed a supplemental report on March 3, 1976. Although the supplemental report "leaves much to be desired," it discloses "what path the commisioners took through the maze of conflicting evidence" to a sufficient extent that, when read in light of the hearing transcript and the exhibits, it meets the minimum constitutional standards set forth by the Court in *United States v. Merz, supra.*

### The Land Taken

The defendants owned a 275-acre tract in Monroe County, Tennessee. Seventy-two acres were taken by TVA in connection with its Tellico Project. The northern edge of the tract borders on the Little Tennessee River. A gravel road runs east and west through the tract, bordered on the north by bottom land and on the south by wooded mountain land.

Three parcels were taken. Parcel One is located between the river and the gravel road. It consists of seventy-one acres, 47 of which are river-bottom land. The remaining twenty-four acres are woodland, including an 18-acre island in the middle of the river known as "Upper Harrison Island."

The second parcel is located south of the gravel road at the western edge of the tract. It consists of approximately .4 acre. Parcel Three is located below the road and

east of Parcel Two. It consists of approximately .6 acre.

### The Award

The Commission determined in both its original and supplemental reports that $62,-000.00 represented just compensation for the 72 acres that were taken. The reports disclose that this figure was arrived at in the following manner. Twenty acres, including Upper Harrison Island, were found to have the highest and best use of recreational development. Supplemental Report at 2. The remaining 52 acres were considered high grade river-bottom land with farming as the highest and best use. The Commission concluded that the landowners would be damaged to the extent of $538.00 for each acre of bottom land taken and $1,800.00 to $2,000.00 for each acre of recreational land taken before special benefits and other factors were taken into consideration. Supplemental Report at 3.

These values were reduced by the special benefits that the Commission concluded would accrue to the remainder. Specifically, the Commission found that the remainder would be enhanced by the projected improvement of the gravel road and by a projected embayment that will be located near the remaining bottom land and to which the landowners will share with other landowners a common right of access. The Commission also noted that the landowners would be damaged by the loss of a fence that was located on the land taken.

In determining the amount of special benefits, the Commission noted that the embayment will be shallow, that the taking will diminish the quantity of land that fronts on the river, and that the land taken that will be contiguous to the remainder will be mud flats for five months a year. For the foregoing reasons, the Commission reduced the initial damage figure of $538.00 for each acre of bottom land taken to $500.00 per acre, and the initial damage figure of $1,800.00-$2,000.00 for each acre of recreational land taken to $1,800.00 per acre.

### Standard of Review

Before reviewing the evidence and passing on the merits of this action, it is important to explicate the standards which have guided the Court on review. Rule 71A(h), F.R.C.P., provides in pertinent part that the findings of the Commission shall be treated as if they were the findings of a master appointed under Rule 53. Rule 53(e)(2) requires the Court to accept a master's findings unless they are clearly erroneous. *See United States v. Merz, supra.*

A finding of fact is clearly erroneous if it is (1) based upon a substantial error in the proceeding, (2) based upon a misapplication of controlling law, (3) unsupported by substantial evidence, or (4) contrary to the clear weight of the evidence. *United States v. Waymire,* 202 F.2d 550 (10th Cir. 1953); Annot., 8 A.L.R.Fed. 180, 271 (1971).

Once the threshold determination has been made that a finding is clearly erroneous, the Court has the authority to make its own findings and modify the report accordingly. *United States v. 1516.90 Acres,* 405 F.2d 913 (6th Cir. 1968), *cert. den.,* 395 U.S. 909, 89 S.Ct. 1752, 23 L.Ed.2d 222 (1969).

### Valuation Testimony

The landowners called six witnesses and TVA called seven witnesses during the four-day hearing. Of these witnesses, one called by the landowners and three called by TVA gave their opinions on the monetary amounts which they believed represented just compensation.

L. H. Pruett, an appraiser employed by TVA, testified that the highest and best use of the entire tract was farmland. (Tr. 462). Before offsetting special benefits, he placed a gross value of $650.00 per acre on the river-bottom land, $350.00 per acre on the island, and $225.00 per acre for the wood land that is located south of the gravel road. He said that $550.00 per acre of special benefits would inure to 21 acres of the remaining bottom land as a result of the projected embayment. (Tr. 508, 557).

Pruett's valuation testimony can be summarized as follows:

```
Value of 275 acre tract before the taking $96,575.00
Value of remaining 203 acres without special
 benefits -57,725.00
Difference without special benefits $38,850.00
Special benefits -10,500.00
Net damage to landowners $28,350.00[1]
```

Hop Bailey, a private real estate appraiser, also testified on TVA's behalf. He stated that the highest and best use of the land taken was farming. (Tr. 713). When asked if good river-bottom land could have a fair market value of $1,000.00 per acre, he stated that a farmer could not pay that price and have "any kind of return on [his] money." (Tr. 719).

Bailey said that the completion of the project will enhance the value of thirty-seven acres of the remaining bottom land by $250.00 per acre. (Tr. 661). He based this opinion on the premise that the projected embayment and access rights that the landowners will have to the projected lake would make the 37 acres desirable for residential development. (Tr. 661–62).

Bailey valued the bottom land and the island at $500.00 per acre before considering special benefits. His valuation testimony can be summarized as follows:

```
Value of 275 acre tract before the taking $96,000.00
Value of remaining 203 acres without
 special benefits 60,000.00
Difference without special benefits $36,000.00
Special benefits - 9,250.00
Net damage to landowners $26,750.00
```

1. Pruett's final computation differs slightly from his valuation testimony as we understand it. Using the per acre values which he gave, we have arrived at the following computation:

```
Entire tract: 84 acres of bottom land at
 $650.00 per acre: $54,600.00
 24 acres of woodland at
 $350.00 per acre: 8,400.00
 167 acres of wooded mountain
 land at $225.00 per acre 37,575.00
 $100,575.00

Land Taken: 47 acres of bottom land at
 $650.00 per acre $30,550.00
 24 acres of woodland at
 $350.00 per acre 8,400.00
 1 acre of wooded mountain
 at $225.00 per acre 225.00
 $39,175.00

Difference: $61,400.00

Special Benefits: $550.00 per acre
 enhancement of 21 acres: 11,550.00

Net difference: $72,950.00

Net damage ($100,575.00 - $72,950.00) $27,625.00
```

Lewis Pipkin is a private appraiser who does most of his work for governmental agencies. He concluded that the land's highest and best use was farming. (Tr. 824). He stated that the land was physically suited for recreational development before the taking, but that such factors as limited highway access and the absence of demand for recreational development in that area precluded him from basing an appraisal on a potential use of recreational development. (Tr. 827). It appears that he valued the bottom land at approximately $650.00 per acre. (Tr. 861). He testified that 20 acres of the remainder will be best suited for residential development after the project is completed and that the projected embayment will enhance the value of this land by $500.00 per acre.[2]

Pipkin's valuation testimony can be summarized as follows:

```
Value of 275 acres tract before the taking: $104,900.00
Value of remaining 203 acres without
 special benefits: -68,100.00
Difference without special benefits: $ 36,800.00
Special Benefits: - 7,200.00
Net damage to landowners: $ 29,600.00
```

Pruett and Bailey based their opinions in part on the following transactions which were offered into evidence by TVA as comparable sales:

| Sale | Date | Acres | Clear | Woods | Bottom | Price/* Acre | Adj.* Price |
|------|------|-------|-------|-------|--------|-------------|-------------|
| 1. Garner-Appalachia, Inc. | 3-1-73 | 385.8 | 310.8 | 75 | 10 | $485. | --- |
| 2. Woodby-McLemore | 1-19-73 | 102.4 | 90 | 12.4 | 75 | $311. | --- |
| 3. McCollister-Peters | 3/72 | 211.6 | 200 | 11.6 | - | $241. | --- |
| 4. Barker-Atkins | 6-6-74 | 154 | 79 | 75 | 30 | $318. | --- |
| 5. Lee-Hall | 8-2-72 | 189 | 139 | 50 | 25 | $175. | $218. |
| 6. Moser-ArkLand Co. | 4-10-72 | 194 | - | 194 | - | $125. | $156. |
| 7. Wilson-Carson | 5-10-72 | 58 | 7 | 50 | 0 | $171. | --- |
| 8. Singleton-Ramsey | 6-27-72 | 127-1/2 | 107-1/2 | 20 | 50 | $312. | $380. |

*This represents the bare land price.

2. Although Pipkin concluded that $10,000.00 in special benefits would accrue to the remainder, he deducted $2,800.00 from this amount for the value of a barn that would have to be destroyed if the land were to be developed as a residential area. (Tr. 806).

| Sale | Date | Acres | Clear | Woods | Bottom | Price/* Acre | Adj.* Price |
|------|------|-------|-------|-------|--------|------|------|

Pipkin based his appraisals in part on the above sales numbered 1, 2, 3 and 6 as well as the following three sales:

| Sale | Date | Acres | Clear | Woods | Bottom | Price/* Acre | Adj.* Price |
|------|------|-------|-------|-------|--------|------|------|
| 9. Cardwell-Hill | 5-9-72 | 52.27 | 52.27 | – | 52.27 | $538. | $660. |
| 10. Cardwell-Hill & Hill | 5-9-72 | 116 | 76 | 40 | – | $270. | $335. |
| 11. Best-Steel | 8/72 | 26-1/2 | 16 | 10-1/2 | 26-1/2 | $415. | $514. |

* This represents the bare land price.

As developed by counsel for the landowners on cross-examination, none of these sales involved property that was located on the Little Tennessee River. The Commission held that each of these sales was admissible and that any dissimilarities between them and the property in question went to the weight of the evidence.

TVA attempted to prove special benefits by introducing evidence that purported to show the amount by which the value of certain properties increased due to TVA's construction of lakes in the course of the project. A list showing the increase in value of these properties is contained in Exhibit G–16. The net enhancement per acre ranged from $317.00 to $1,046.00.

The primary appraisal witness for the landowners was Charles Jessie. He stated that he walked through all of the property except the island, which he viewed from both sides of the river. (Tr. 189). He testified that the highest and best use of the land taken was recreational development, and cited as a basis for this opinion the proximity of the land to Chilhowee Lake, the Little Tennessee River and the Cherokee National Forest. (Tr. 190).

Jessie agreed that the 167 acres located south of the gravel road was "billy goat land" and valued it at $500.00 per acre. (Tr. 193–94). He valued the land located north of the road at $3,000.00 per acre. When asked to state the basis for this appraisal, he stated:

"Well, we've sold farm ground for over $2,000 an acre. In fact, in Loudon County we sold farm ground for over $2,000 an acre, so this ground, naturally, with recreational potential, would be more expensive." (Tr. 193).

Jessie's valuation of the land, which he based on the premise that its highest and best use was for recreational development, can be summarized as follows: (Tr. 192).

```
Valuation of 275 acre tract before the taking $407,500.00
Valuation of remaining 203 acres 194,000.00
Damage to landowners $213,500.00
```

The transaction relied on by Jessie as a comparable sale was the sale of the Harrison Farm in Loudon County, Tennessee. The farm consisted of 209 acres and was divided into tracts and sold at an auction sale. Nine tracts consisting of 103 acres apparently were grouped together and sold to one buyer for $113,063.00. (Tr. 225, 230). The Commission permitted this sale to be introduced into evidence on the theory that any dissimilarities between it and the subject property would be developed on cross examination. (Tr. 229).

Jessie also testified that a ¼ acre pie-shaped lot on Citico Creek was sold at an auction sale for $1,900.00 and that several other lots with 80 to 100 feet of frontage on Citico Creek were sold for $5,700.00 per lot. (Tr. 213). A cabin valued at approximately $2,000.00 was located on each of the latter lots and was included in the sale price.

Jessie referred to two sales which TVA considered to be comparable sales. He said that the land sold by Garner to Appalachia, Inc. on March 1, 1973 had soil similar to clay, (Tr. 234), and that the land sold by

Wilson to Carson on May 10, 1972 had no river access and such poor roads that he couldn't drive his car up to the property. (Tr. 235). He considered neither the Wilson nor Garner land to be comparable to the land in question.

The landowners apparently intended to proceed on the alternative theory that the highest and best use of the land was farm-

ing, as Jessie was asked to appraise its value as farmland. After noting his experience in selling land, he stated, in effect, that he never saw farm land in East Tennessee that was better than the land in question. (Tr. 232).

Jessie's appraisal in terms of its suitability for farming can be summarized as follows:

```
Value of entire 275 acre tract before the
 taking: $299,500.00
Value of remaining 203 acres after the
 taking: 157,000.00
Damage to the landowners: $142,500.00
```

The other witnesses called by the parties testified about various aspects of the land which were relevant to the question of value. The Court has examined their testimony but has chosen not to summarize it except when necessary to deal with the exceptions made by each party to the Commission's report.

### TVA's Exceptions to the Supplemental Report

TVA has excepted to the supplemental report on three grounds. First, TVA contends that the Commission erred in fixing a value of $1,800.00 per acre for twenty acres of the land taken. The Commission based this part of its award on the finding that the highest and best use of this land was recreational development.

We accept the Commission's finding that the potential for recreational development of some of the condemned property could have influenced the price that an interested buyer would be willing to pay for it. We hold, however, that the Commission erred in finding that 20 acres of the land taken had the highest and best use of recreational development, and find that only the 18-acre island had such a potential use. We further hold that the $1,800.00 per acre valuation is against the clear weight of the evidence and must be reduced.

■ It is well settled that a landowner must be compensated for the fair market value of his property on the basis of the property's highest and best use. *E. g., United States v. 1,291.83 Acres,* 411 F.2d

1081 (6th Cir. 1969). "[A] potential future use of condemned property should be considered not as the present measure of value but only to the extent that the prospect of demand for such use would have affected the price a willing buyer would have offered for the property just prior to the taking." *Id.* at 1084.

■ Four elements must be proven by the landowner before a potential use can be said to have influenced the fair market value of condemned land: (1) the potential use must not require a substantial expenditure of capital, (2) the project must not be highly uncertain, (3) the property must be physically adaptable to the potential use, and (4) a market for the property must have existed, in fact, at the time of the taking or must have been reasonably likely to exist in the near future. *Id.* at 1084–85.

■ The proof showed that Upper Harrison Island was being used as woodland at the time of the taking. It was last used as farm land approximately 18 years ago. (Tr. 44). Most of the island was covered with woods, and it was estimated that the land could be cleared at a cost of $3,000.00. (Tr. 218). There is no question that the soil on the island, as well as that on the bottom land, was excellent for farming.

It does not appear that a substantial capital expenditure would have been required to develop the island for recreational purposes. The island was not connected to the bottom land by a bridge. Roy Dorsch, a witness called by TVA, estimated that it

would cost $100,000.00 to build a one-lane bridge and $190,000.00 to build a two-lane bridge. (Tr. 771). The proof showed, however, that alternative means of access were available. Austria Cummings Harrison testified that a barge was once used by her father to reach the island (Tr. 45), and that a new barge could be purchased for approximately $2,500.00. (Tr. 46).

Much of the testimony was directed toward developing the island to provide overnight facilities for trout fishermen. An inference can be drawn from the record that the island could be developed for camp sites or bare overnight facilities without the expenditure of substantial capital. A commercial enterprise located across the river and owned by Hoss Holt provided meager overnight facilities in the form of a metal-sided building. (Tr. 119).

A project of this nature cannot be said to be highly uncertain and speculative. L. Price Wilkins of the Tennessee Wildlife Resources Agency cited a study that showed that approximately 30,000 fishing trips are made on the Little Tennessee River each year. (Tr. 77, 79). He stated that more trips would be made if adequate overnight facilities were available. (Tr. 119). It is reasonable to conclude that a fishing camp or similar development would meet with some commercial success if it were pursued, and that the likelihood of such success would affect the price that a willing buyer would pay for Upper Harrison Island.

There is no question that Upper Harrison Island was physically adaptable to recreational development. The Little Tennessee River was described as one of the best trout fishing rivers in the Southeastern United States. (Tr. 85). Much of its success as a trout stream, however, stems from the fact that it is stocked by the State of Tennessee each year.

■ Finally, there is some proof that a market for the island existed or was reasonably likely to exist in the near future.

Richard Keen, a real estate agent in Knoxville, Tennessee, testified that there would have been a demand for the island had it been placed on the market. (Tr. 294–95). Austria Cummings Harrison testified that at one time several persons were interested in purchasing the island. (Tr. 53).[3]

Several of the landowners' witnesses opined that the demand for recreational property was thwarted by TVA's announcement of the Tellico Project in 1964 or 1965, but these opinions seem to have been based on speculation.

For these reasons, we conclude that the potential of Upper Harrison Island for recreational development could be found to have influenced its fair market value, and the Commission's finding in this respect must be affirmed.

■ The Commission's finding that a total of 20 acres of the land taken had the highest and best use of recreational development, however, must be modified. The 20-acre total includes Upper Harrison, which consists of 18 acres. It is not clear from the supplemental report which additional 2 acres were relied upon to arrive at the 20 acres total. There is nothing in the record which suggests that two acres of the bottom land were unique or different from the other bottom land in any respect. Accordingly, we hold that only 18 acres can be said to have had the highest and best use of recreational development, and that the two acres the Commission initially included in the 20-acre figure must be valued at the same price that the Commission placed on the other bottom land that was taken.

■ The Commission's valuation of the land suited for recreational development also must be modified because it is against the clear weight of the evidence. As previously noted, Charles Jessie, the landowners' primary appraisal witness, testified that the land was worth $2,000.00 per acre as farmland and $3,000.00 per acre as recreational

---

**3.** Although it is impermissible for a landowner to prove the amounts that he has been offered for his land by interested buyers, *Sharp v. United States*, 191 U.S. 341, 24 S.Ct. 114, 48 L.Ed. 211 (1903), it seems appropriate to permit a landowner to show that offers of purchase have been made for the limited purpose of establishing the existence of a market.

land. *Supra* at 936. Although we find his appraisal figures to be inflated, it can be inferred from his testimony that the recreational potential of the land enhanced its value by $1,000.00 per acre. The value that the Commission placed on the recreational land, however, exceeded the value it placed on the farmland by $1,300.00 per acre.

None of the TVA's witnesses gave an appraisal figure based on the highest and best use of recreational development. Jessie was the only witness called by the landowners who gave such an appraisal. We accept Jessie's testimony to the extent that it supports the finding that the recreational potential of Upper Harrison Island would make it more valuable than farmland. Since we believe that his overall appraisal was inflated, and in light of our examination of the entire record, we conclude that the value of the entire tract was diminished by a net amount of $1,000.00 for each acre of Upper Harrison Island that was taken.

■ TVA next contends that it cannot determine from the supplemental report whether the Commission based its award on a valuation of the land before and after the taking or whether it valued each condemned acre of land separately and independently. The Commission was instructed to value the land as a whole (Instructions to Commission at 10), and that the measure of just compensation is "the difference between the fair and reasonable market value of the land immediately before the taking and the fair and reasonable market value of the portion that remains after the taking. . . ." *Id.* at 11–12.

The Commission did not specify these values in its original or supplemental report. Although it would have been desirable to specify these values, we do not believe that the failure to do so represents reversible error under the facts of the present case. All but one witness was asked to state his appraisal on the basis of the difference between the value of the land before the taking and after the taking. Only one witness was asked to value the land taken on an independent basis. This witness merely stated that the land taken was priceless.

(Tr. 68–70). The pattern of direct and cross-examination was closely tied to the before and after formula.

Moreover, the attorneys for TVA and the landowners engaged in an extended discussion on the proper valuation formula at the outset of the hearing. (*See* Tr. 54–68). Counsel for TVA read the Court's instructions on this matter to the Commission. (Tr. 59). The Chairman of the Commission acknowledged that he was bound by the instructions. (Tr. 67). In light of the foregoing, we are satisfied that the Commission based its award on the difference between the fair market value of the land before the taking and after the taking.

TVA's final contention is that the Commission did not fix the value of the special benefits which will accrue to the remainder, that special benefits were not considered in reaching the final award, and that special benefits were offset by severance damages although severance damages were neither claimed nor proven. For these reasons, TVA contends that this case should be resubmitted to the Commission with instructions to amend its report.

It is obvious from the supplemental report that the Commission found that special benefits would accrue to some of the remainder. As previously noted, the Commission initially reached a damage figure of $538.00 per acre for each acre of farmland taken and $1,800.00–$2,000.00 per acre for each acre of recreational land taken. It reduced these amounts to $500.00 per acre and $1,800.00 per acre after considering the net effect of special benefits. *See supra* at 933. Although this reduction in the award is much less than the value of the special benefits that TVA's witnesses claimed would accrue to the remainder, it was arrived at by the Commission after considering such factors as the shallowness of the projected embayment and the fact that the remainder will be bordered by mud flats for five months of each year.

■ The Commission stated in the supplemental report that it weighed the

special benefits against the severance damage. It appears from the record that the landowners' witnesses did not believe that there would be any severance damage.[4] (*See* Tr. 272). Since the Commission clearly stated both the positive and negative effects that the Tellico Project would have on the remainder, it cannot be said that TVA was prejudiced in any way by a perhaps inadvertent reference to severance damages in the supplemental report.

### Exceptions of the Landowners

The landowners filed thirteen exceptions to the original report of the Commission. No exceptions to the supplemental report have been filed and the time for doing so has expired. See Rule 53(e)(2), F.R.C.P. The exceptions will be treated seriatim.

"1. The Commissioners refused to consider the evidence which was placed into the record by way of avowal that directly across the river from the subject property the appraiser for TVA, who was a witness in the case at bar, appraised the 11.5 acres for $140,000.00 and the only improvement on said real estate consisted of a concrete block building valued at $10,-000.00."

▆▆ The property referred to in this exception was located across the river from Upper Harrison Island and owned by Hoss Holt. Holt owned approximately 100 acres of land (Tr. 629) and operated a boat rental business on a portion of this land for approximately ten years. (Tr. 630). He owned about 40 boats which he leased to trout fishermen. (Tr. 904). The record discloses the number of boat rentals that occurred between 1968 and 1973. (Tr. 905). Overnight facilities were available in a large metal-sided building.

By way of avowal it was shown that TVA had acquired 11.1 acres of the Holt property, and that Pruett appraised this property

at $141,000.00, including improvements. (Tr. 952, 958). The bare land value, as appraised by L. T. Pruett, was $130,500.00. (Tr. 952).

Counsel for the landowners initially questioned Pruett about the Holt property for the limited purpose of showing that the highest and best use of the landowners' property was recreational development. (*See* Tr. 524). The details of Holt's business were thoroughly explored before the Commission. (*See, e. g.,* Tr. 624-33, 893, 905).

Counsel for the landowners then attempted to elicit the appraisal figure which Pruett placed on the Holt property during the course of his employment with TVA. (Tr. 893). TVA objected and contended that such evidence was inadmissible because it essentially was evidence of the price that TVA paid for the property. (Tr. 894). The Commission, after hearing the arguments of counsel, ruled the evidence inadmissible (Tr. 902), but it allowed counsel for the landowners to continue to explore other aspects of Holt's property and business operation. The landowners excepted to the Commission's refusal to hear the appraisal testimony and offered such testimony into the record by way of avowal at the close of the hearing. (Tr. 949-60).

As stated in the Court's Instructions to the Commission:

"[t]he price the Government has paid for other property is not admissible in evidence and is incompetent to prove the market value of land under condemnation. Such sales are not fair criterion of value for the reason that they are not free sales but are in the nature of a compromise to avoid a lawsuit. Likewise what the Government has offered for other property is not admissible in evidence and should not be considered in making your determination of just compensation for the property taken." In-

---

4. As stated by the Supreme Court in *United States v. Miller,* 317 U.S. 369, 376, 63 S.Ct. 276, 87 L.Ed. 336 (1942), any element of value arising out of the relation of the part of the land taken to the entire tract is "somewhat loosely" spoken of as severance damages. It includes the depreciation in value of the remainder which has been occasioned by the taking. *United States v. 105.40 Acres,* 471 F.2d 207, 211 (7th Cir. 1972).

structions to Commission, at 18 (footnotes omitted)

Had the Commission allowed Pruett to testify as to the value that he placed on the Holt property during the course of his employment with TVA, it would have permitted the landowners, as a practical matter, to prove indirectly a matter that could not be proven directly. For this reason, we hold that the Commission properly excluded this evidence.

"2. The Commission erred in not finding that the highest and best use for the subject property was recreational development as there was overwhelming evidence to the effect that same would have been developed into recreational property had not TVA started planning the proposed project in 1942 and advised the property owners in 1964 not to make any improvements and the dam at Chilhowee was constructed in 1957, which lent itself to the great desirability of the subject property for recreational development making same the best trout stream in southeastern United States."

 This exception was made before the Commission filed its supplemental report and has not been revised to conform with the finding that 20 acres of the land taken had the highest and best use of recreational development. In light of our previous analysis of the evidence, we hold that the Commission's finding that the highest and best use of the bottom land was farming is not clearly erroneous; and, in our opinion this finding is supported by the clear weight of the evidence.

"3. The Commission erred in considering the benefits of the paving of the road in front of the subject property when it is common knowledge that this well-traveled road would have been paved from 1964 up until the date of taking had not the paving of roads in the affected area of the Tellico project been taken over by TVA."

 This exception is based entirely on speculation. What the landowners refer to as "common knowledge" was not proved to any degree of certainty at the hearing.

"4. The Commission erred in allowing TVA witnesses to testify relative to value before these witnesses determined the highest and best use of said property, and not in one instance did their witnesses use a comparable piece of property involving a river bottom in any way similar to subject property."

We have previously listed the sales which TVA alleged involved land that was comparable to the land in question.

The similarities and dissimilarities between these parcels and the land in question were exhaustively developed by counsel for each party on direct and cross-examination. The Commission allowed each sale to be admitted into evidence and held that it would weigh the probative value of each sale in terms of comparability.

The record shows that on several occasions the Commission sustained the landowners' objections that comparability had not been established to an extent that would justify the admission of the sale prices into evidence (*E. g.*, Tr. 409, 436). In each instance the facts were more fully developed before the sale price was stated.

 The Commission is vested with considerable discretion in admitting or excluding evidence of comparable sales. *See generally* Annot., 8 A.L.R. Fed. 180, 247 (1971). It did not abuse this discretion by allowing these sales to be admitted into evidence and providing the landowners with an adequate opportunity to develop the similarities and dissimilarities of each sale.

"5. The Commission erred in considering any evidence in behalf of TVA witnesses when TVA deposited the sum of $43,500.00 with the filing of a Complaint after an exhaustive appraisal stating that same was just compensation for the property taken and then in the trial of the action testified that the damages suffered were in the sum of $28,500.00 and, in addition thereto, placed considerable credence on a sale alleged to be comparable where said sale, according to their testimony, was for $55,000.00 and according to the true facts as revealed to the

Commission, the sale was in excess of $125,000.00."[5]

The first portion of this exception is plainly without merit. The Government is not bound by the amount which TVA paid into Court. *See* 40 USC § 258a *United States v. Miller, supra.* The second portion of this exception relates to a disputed question of fact in regard to the actual sale price of a parcel introduced by TVA as a comparable sale. TVA's witness said the sale price was $55,000.00 (Tr. 447) and the landowners' witnesses said the sale price was $125,000.00 (Tr. 929, 936). The merits of this factual dispute were fully developed and presumably resolved by the Commission.

"6. The Commission erred in not taking into consideration that the gravel road would more than likely have been blacktopped if it had not been for TVA's actions, especially in light of the fact that there are 30,000 trips per year on the river involved and the great majority of same emanate from in front of the subject property across the river."

This exception is essentially the same as Exception No. 3 and warrants no further consideration.

"7. The Commission erred in considering testimony of a tract of land that was under condemnation by TVA along the Tennessee River when both the buyer and the seller knew that TVA was going to take the property, and the sale was for exactly what TVA had offered."

This exception apparently refers to the Garner to Appalachia, Inc. sale. (Tr. 409–31). The transaction was consummated between two private parties at a time when a temporary injunction issued by this Court was in effect. (Tr. 422). The injunction, which temporarily halted the Tellico Project, was issued on the ground that TVA's environmental impact statement was inadequate. *See Environmental Defense Fund v. TVA*, 339 F.Supp. 806 (E.D.Tenn.), *aff'd*, 468 F.2d 1164 (6th Cir. 1972); 371 F.Supp. 1004 (E.D.Tenn.1973), *aff'd*, 492 F.2d 466 (6th Cir. 1974).

The circumstances surrounding the sale were fully brought to light before the Commission. (*See* Tr. 409–23). The effect that the temporary injunction and the threat of future condemnation had on the selling price went to the weight rather than the admissibility of the evidence.

"8. The Commissioners erred in refusing to consider the sale on Citico Creek of 25 acres for $75,000.00, which is located some two miles from subject property on a creek that is approximately 40 feet wide, said sale having been made in 1975 at public auction."

The record shows that the Commission allowed the sale of this property to be admitted into evidence. (*See* Tr. 206–13). Counsel for the landowners was permitted to explore the details of this sale. (*See* Tr. 211). The exception, therefore, is without merit.

"9. The Commission erred in refusing to receive into evidence a comparable sale of a total auction where the only thing necessary for the public auction to be held and a farm being sold in smaller tracts was the marking off of the tracts into smaller acreages, it being shown that this is the customary way to sell property in the subject area and the subject farm being peculiarly located in such a manner it would be advantageous for this type sale."

The Commission permitted Charles Jessie to testify about several auction sales. (Tr. 219–32). The Commission received this evidence over TVA's objection. There was some discussion at the close of this testimony about making an offer of proof on two additional auction sales. (*See* Tr. 241–42, 244). As far as we can determine from the record, these sales were never offered into evidence. The details of the other auction sales were fully explored, however, and Jessie was permitted to state his opinion that "one of the more acceptable methods of conducting sales of large tracts of real es-

---

5. The $43,500.00 figure appears to be erroneous, as both the Declaration of Taking and the Order Allowing Withdrawal of Funds state that $41,350.00 was paid into Court by TVA.

tate" in East Tennessee is by auction. (Tr. 242).

"10. The Commission erred in refusing to accept testimony as to the reasonable market value of the land taken where the witnesses for the landowner stated they thought there was no benefit or damage to the property remaining where it was to be used for recreational purposes. The finding is contrary to the overwhelming weight of the evidence, especially in light of the fact that one of the main comparables used by TVA was a sale wherein their witnesses used $55,-000.00 when in reality it was over $125,-000.00."

This exception apparently refers to the Commission's refusal to accept Charles Jessie's testimony that the land in question had a value of $2,000.00 per acre as farmland and $3,000.00 per acre as recreational land. As previously noted, we consider these values to be inflated. The Commission acted well within the bounds of reason in not accepting his testimony in that respect.

"11. The Commission erred in allowing a chart to be used for the purpose of showing increased value of land due to the fact that the lake was to be built in the future where water rights are obtained."

This exception refers to Exhibit No. G–16, a chart introduced into evidence by TVA to summarize testimony on the extent to which the development of lakes enhanced the values of certain properties. The degree to which the alleged enhancement of these parcels was relevant to the enhancement of the land in question was fully developed on direct and cross-examination. Accordingly, this exception must be overruled.

"12. The Commission erred in receiving as exhibits slide photographs depicting the river where they had arranged to take photographs when the dam was shut down and this condition had occurred .006 percent of the time since 1957 and this was highly prejudicial to the defendants."

TVA admitted that the photographs referred to in this exception were taken on one of the rare occasions when the dam was shut down. (Tr. 573). The circumstances existing when the photographs were made and the effect that the shutting down of the dam had on the water levels were fully developed before the Commission. The bearing that these factors might have on the question of value goes to the weight rather than the admissibility of this evidence.

"13. The Commission erred in allowing counsel to repeatedly refer to land involved in the Tellico Project that had been heard by the Commission in other cases where this defendant did not have an opportunity to cross-examine intelligently in regard to same, especially in light of the fact that this Commission hears any number of cases involving the area and each case should be tried individually."

This exception apparently refers to the testimony of L. H. Pruett in regard to the sale of several parcels of land located along the Little Tennessee River. (See Tr. 385–99). TVA did not offer these sales into evidence as comparable sales because they were too far removed in time from the date of the taking. (Tr. 386, 392). Counsel for TVA stated that he was offering this proof for the limited purpose of showing Pruett's familiarity with the real estate transactions that have occurred in the Tellico area. (Tr. 386). The Commission admitted the proof solely for such purpose. (Tr. 387). No sale prices were offered into evidence. We do not believe that the landowners were prejudiced in any way by this ruling.

## Conclusion

For the foregoing reasons, we hold that the difference between the fair market value of the property in question before the taking and after the taking, including special benefits, is $45,000.00. Accordingly, it is ordered that judgment be, and the same hereby is, entered for the landowners and against TVA for that amount.

The Court has carefully examined the entire seven volumes of testimony (961

pages) together with the exhibits that were filed herein. Much of the testimony has been read on several occasions. The Court has been mindful of the fact that "the District Judge has wide latitude to act as an impartial arbiter to protect the interests of both the landowner and the Government." *United States v. 1516.90 Acres,* 405 F.2d 913, 915 (6th Cir. 1968), *cert. den.* 395 U.S. 909, 89 S.Ct. 1752, 23 L.Ed.2d 222 (1969). We feel that the award we have reached is fair to the landowner and fair to the Government.

■ Finally, for the purpose of future guidance only, we note that a substantial portion of the record consists of objections and arguments between counsel. This probably accounts, in some part at least, for the large size of the record. In future cases, the Chairman, who is the only lawyer on the Commission, should rule promptly on each objection when it is made and should not hesitate to intervene when it appears that arguments between counsel are developing. Counsel should direct their arguments solely to the Commission, and then only when argument is requested. The Court expects that proper decorum be maintained at all times.

Order Accordingly.

## SUPPLEMENTAL MEMORANDUM

The landowners have moved in the alternative that the Court (1) grant a new trial, or (2) amend its findings of fact and conclusions of law pursuant to Rule 59, F.R.C.P., or (3) correct its judgment pursuant to Rule 60, F.R.C.P., or (4) amend its findings and judgment pursuant to Rule 52(b), F.R.C.P.

The landowners first contend that the Court should modify its judgment to provide that the value of the entire tract was diminished by $1500.00 for each acre of Upper Harrison Island that was taken rather than the $1000.00 per acre value arrived

at in the Court's Memorandum Opinion and Order of March 25, 1976. In support of this contention the landowners quote the following language from that opinion:

"Although we find his appraisal figures to be inflated, it can be inferred from his testimony that the recreational potential of the land enhanced its value by $1000.00 per acre. The value that the Commission placed on the recreational land, however, exceeded the value it placed on the farmland by $1300.00 per acre."

This statement was made in the context of the Court's holding that the Commission's valuation of the recreational land at $1800.00 per acre [1] was clearly erroneous because it was against the clear weight of the evidence. By the above-quoted language the Court was pointing out that the Commission's valuation of the recreational land at $1300.00 per acre more than it valued the farmland ($500.00 per acre) was not even supported by the inferences that could be drawn from the testimony of the landowners' most favorable expert witness. We did not state, nor did we intend to imply, that the recreational land, in fact, was worth $1,000.00 per acre more than the farmland.

On the same page of the Memorandum Opinion, the Court, in valuing the island at $1000.00 per acre, made it clear that it did not accept the inference from Jessie's testimony that the island was worth a full $1000.00 per acre more than the farmland, or $1500.00 per acre.

"We accept Jessie's testimony *to the extent* that it supports a finding that the recreational potential of Upper Harrison Island would make it more valuable than farmland. Since we believe that his overall appraisal was inflated, and in light of our examination of the entire record, we conclude that the value of the entire tract was diminished *by an amount*

---

1. The parties have referred to the value of the land taken on a "per acre" basis. Each acre of the land, of course, was not valued separately and independently. Just compensation was determined by subtracting the fair market value of the land remaining after the taking from the fair market value of the entire tract immediately before the taking. Our reference to the value of the land on a "per acre" basis is simply a shorthand way of stating how much the value of the entire tract was diminished by each acre of land that was taken.

of $1000.00 for each acre of Upper Harrison Island that was taken." (emphasis added).

Accordingly, we held that it was not clearly erroneous for the Commission to place a higher value on the recreational land than it placed on the farmland. In respect to *how much more valuable* the recreational land was than the farmland, however, we held that the Commission's finding was clearly erroneous. Once a court determines that a finding is clearly erroneous, it has the authority to make its own findings as to damages. *United States v. 1516.90 Acres,* 405 F.2d 913 (6th Cir. 1968), *cert. den.* 395 U.S. 909, 89 S.Ct. 1752, 23 L.Ed.2d 222 (1969).

The Court, after considering all the evidence of record, valued the island at $1000.00 per acre. This reduced the Commission's award as to the island by $800.00 per acre. The Court was not required to accept the dollar values which Jessie placed on the recreational land. Expert opinions on damages are advisory only. They must be weighed together with all the evidence of record and should never be blindly accepted. *See e. g., Sartor v. Arkansas Gas Corp.,* 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1943).

In summary, the Commission's finding that the farmland was worth $500.00 per acre was affirmed. The Court modified the Commission's report and held that the island was worth $1,000.00 per acre. It necessarily follows that the Court considered the island to be worth only $500.00 per acre more than the farmland. The Court reaffirms its holding that the remuneration to which the landowners are entitled is $45,000.00, that is, $500.00 for each of the 54 acres of farmland that was taken, and $1000.00 for each of the eighteen acres of island that was taken.

The landowners also contend that the Court had no jurisdiction to consider TVA's objections to the Commission's report because they were not timely filed. The chronology of this case may be summarized as follows. The initial report was filed on November 21, 1975. The landowners objected on December 3, 1975 (12 days later)

and TVA objected on December 8, 1975 (17 days later). The transcript of the proceedings before the Commission was filed on February 9, 1975.

On February 12, 1976, the Court determined that the initial report of the Commission was unreviewable for want of specificity and ordered that a supplemental report be filed. The supplemental report was filed on March 3, 1976. TVA objected to the report on March 16, 1976 (13 days later). No additional objections having been filed, the Court entered its Memorandum Opinion and Order on March 25, 1976.

Relying on *United States v. Easement and Right-of-Way,* 386 F.2d 769 (6th Cir. 1967), *cert. den.* 390 U.S. 947, 88 S.Ct. 1034, 19 L.Ed.2d 1136 (1968), the landowners contend that the filing of objections within 10 days after the Commission's award is filed is a jurisdictional prerequisite to judicial review. When that case was decided, 16 U.S.C. § 831x provided in pertinent part:

"Either or both parties may file exceptions to the award of said commissioners within twenty days from the date of the filing of said award in court. . . ."

In regard to this provision, the Court concluded that the 20-day limitation was jurisdictional and that Rule 6(e), F.R.C.P., which allows a party three additional days for mailing, had no application. The Court reasoned that the 20 day period was jurisdictional because it was "part of [the] statute creating the cause of action and establishing jurisdiction in this Court. . . ." 386 F.2d at 771.

The 20-day provision of 16 U.S.C. § 831x has since been repealed, Pub.L.No. 90–536, 82 Stat. 885 (1968), and Rule 53(e)(2), F.R.C.P., now governs the time period for the filing of objections. Rule 71A(h), F.R.C.P. Therefore, *United States v. Easement and Right-of-Way, supra,* is not controlling, as its holding is limited to the interpretation of a statutory provision which was not in effect at the time the exceptions were filed in the present case.

Rule 53(e)(2), F.R.C.P., provides in pertinent part:

"Within 10 days after being served with notice of the filing of the report any party may serve written objections upon the other parties."

Since the rule gives the parties a right "to do some act or take some proceedings within a prescribed period after the service of a notice upon him," and the Clerk is required by Rule 53(e)(1) to mail all parties notice of the filing, Rule 6(e) gives the parties three additional days in which to make objections. *See 5A J. Moore, Federal Practice* ¶ 53.11, at 2990–91. Accordingly, the parties had 13 days from the filing of the Commission's reports in which to object.

■■■■■ The landowners' objections to the initial report were filed 12 days after the report was filed. Consequently, they were timely when given the benefit of the three additional days provided for in Rule 6(e). TVA's objections were untimely, however, as they were filed 17 days after the report was filed. In light of the Court's determination that the initial report was unreviewable, the landowners were not prejudiced by TVA's untimely objections to it. TVA's exceptions to the supplemental report were made 13 days after that report was filed and thus were timely.

■■■ We further note that the landowners have waited almost four months to complain of TVA's failure to make timely objections to the initial report. Nothing was said of this matter until after the Court rendered its final decision on the merits. It is too late now to contend that the Court could not and should not consider TVA's objections. *5A J. Moore, Federal Practice* ¶ 53.11, at 2991.

The landowners' other contentions may be summarized as follows: (1) the Court should have accepted Jessie's testimony that the island had a value of $3000.00 per acre, (2) the Court should not have modified the Commission's finding that the recreational land was worth $1800.00 per acre, (3) the Court should have set aside the Commission's finding that the bottom land had a value of $500.00 per acre, and (4) the Court has failed to demonstrate that the

Commission's findings as to the value of the recreational land were clearly erroneous.

Since these matters were carefully considered by the Court in arriving at its final judgment and were deemed to be without merit, they warrant no further consideration.

For the foregoing reasons, it is ORDERED that the motion of the landowners that the Court grant a new trial or, alternatively, amend its findings of fact and conclusions of law or, alternatively, correct its judgment or, alternatively, amend its findings and judgment, be, and the same hereby is, denied.